IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **William Johnson** | : | |
| | : | |
| Plaintiff, | : | **Civil Action** |
| | : | |
| v. | : | **No. 24-_____** |
| | : | |
| **City of Philadelphia, Philadelphia District** | : | **Jury Trial Demanded** |
| **Attorney's Office, George Pirrone,** | : | |
| **Richard Harris, Thomas Augustine, John** | : | |
| **McDermott, and Aaron Booker,** | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

### I.    Preliminary Statement

1.      This action seeks relief for the extensive misconduct of detectives in the Philadelphia Police Department's Homicide Division and of the Philadelphia District Attorney's Office ("DAO") whose actions led to the wrongful arrest, prosecution, conviction, and incarceration of plaintiff William Johnson for a murder he did not commit. As a result of the misconduct, Mr. Johnson served 18 years in prison.

2.      On August 26, 2005, at 2:00 a.m., Terrence Flomo, an off-duty Philadelphia police officer seeking the services of a sex worker, was shot and killed near 20th Street and Cecil B. Moore Avenue in North Philadelphia.

3.      Investigating officers interviewed possible witnesses, including Brenda Bowens and Nora Williams, who were sex workers working in that area. Both women denied seeing anything related to the shooting when initially questioned by police.

4.      Re-interviews of Bowens and Williams, during which they were subjected to coercion and threats by detectives, resulted in statements implicating Johnson and his co-defendant, Mumin Slaughter. As a result, both defendants were arrested and charged with murder and related offenses.

5.      At trial in 2007, the jury acquitted both men of first-degree murder, convicted Slaughter of third-degree murder, but could not reach a unanimous verdict for Johnson on the charge of third-degree murder.

6.      Slaughter then sought a deal for a more favorable sentence in exchange for his testimony against Johnson and provided a statement falsely claiming Johnson's involvement in the murder.

7.      However, before the retrial began, Slaughter informed prosecutors that he would refuse to testify, admitting that his statement was false and had been given only to induce Johnson to plead guilty. On the motion of the prosecutor, Assistant District Attorney Carlos Vega, and over the proper objection of Mr. Johnson on hearsay and Confrontation Clause grounds, the prosecution was allowed to repeatedly introduce Slaughter's out-of-court statement at the retrial through other witnesses, without any opportunity for cross-examination of Mr. Slaughter.

8.      Mr. Johnson was convicted of third-degree murder and sentenced to prison for 30-60 years.

9.      Mr. Johnson sought relief in state court and in federal habeas corpus proceedings on Sixth Amendment Confrontation Clause grounds, but the courts ruled that the Confrontation Clause violation—which the DAO conceded—was "harmless error."

10.     In 2020, Brenda Bowens, the primary witness against Mr. Johnson, who had made a full recovery from her drug addiction, and is now a health-care worker in Philadelphia, recanted her trial testimony.  Based on that recantation, Johnson filed a PCRA petition and gained access to the DAO trial file that contained critical exculpatory and impeachment evidence—never disclosed to Mr. Johnson—fully undermining the prosecution's case.

11.     The suppressed evidence included letters sent by the witness Brenda Bowens to District Attorney Lynne Abraham and the trial prosecutor, Carlos Vega, in March 2006, *before the first trial*, in which Bowens explained that her statement implicating the defendants was coerced and false in all respects.  The letters were fully consistent with the recantation made by Ms. Bowens in 2020.

12.     District Attorney Abraham did not disclose the letter she received to the defense, as she considered it, in her words, to be "bullshit." Instead, she simply forwarded the letter to the DAO homicide unit where it was delivered to the trial prosecutor Carlos Vega.  Mr. Vega, pursuant to the policy and practices of the DAO to withhold and suppress *Brady* evidence where prosecutors did not believe the evidence, deliberately failed to disclose it to the defense. Vega suppressed and failed to disclose to Mr. Johnson a similar letter sent directly to him by Ms. Bowens.  Further, Vega suppressed other critical exculpatory and impeaching evidence regarding the witnesses Bowens and Williams.

13.     Based on this newly discovered evidence, Mr. Johnson moved under Fed. R. Civ. P. 60(b) to reopen his habeas proceedings. The prosecution, again agreeing that there had been a Confrontation Clause violation, stipulated that the concealment of the exculpatory and impeaching evidence "that was essential to a fair determination of the prejudice caused by this violation" presented "extraordinary circumstances to undermine the integrity of this Court's

proceedings and raise[] a significant risk of injustice." *Johnson v. Lamas*, No. 2:12-cv-05156, Doc. 36 (E.D. Pa. Mar. 13, 2023).

14.     The District Court, Brody J., ordered Johnson's conviction vacated.

15.     The DAO's subsequent motion to dismiss all charges in the Court of Common Pleas was granted on June 8, 2023.

16.     Mr. Johnson's wrongful conviction was the direct result of the defendant detectives' coercion of witnesses, fabrication of evidence, malicious prosecution, and the policy, practice, and custom of the former DAO of intentionally suppressing exculpatory information in violation of the U.S. Constitution.  As reflected in multiple cases of exonerations of persons convicted of murders they did not commit, these actions were the product of the City's long-standing practice, policy, and custom of failing to train, supervise, and discipline detectives in the PPD Homicide Division to comply with constitutional obligations; the City's acquiescence to improper police practices and customs; and the unconstitutional policies, practices, and customs of former District Attorneys.

## II.     Jurisdiction and Venue

17.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

18.     Venue is proper in this Court as the incidents at issue in this matter occurred within the Eastern District of Pennsylvania.

## III.     Parties

19.     Plaintiff William Johnson is a resident of Philadelphia, Pennsylvania.

20.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department which, at all relevant times, employed the individual defendants.

21.     Defendant Philadelphia District Attorney's Office is the prosecuting agency of the City and County of Philadelphia.

22.     Individual defendants George Pirrone, Richard Harris, Thomas Augustine, John McDermott, and Aaron Booker (collectively "defendant detectives"), former and current detectives in the Philadelphia Police Department, are sued in their individual capacities.

23.     At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Mr. Johnson.

24.     At all times relevant to this Complaint, all defendants acted under color of state law.

## IV.   Facts

### A.   The Murder of Terrence Flomo, Mr. Johnson's Arrest, and the Prosecution's Suppression of Critical Exculpatory Evidence

25.      On August 26, 2005, Terrence Flomo, an off-duty Philadelphia police officer seeking the services of a sex worker, was shot and killed near 20th Street and Cecil B. Moore Avenue in North Philadelphia.

26.     Investigating officers interviewed Brenda Bowens and Nora Williams, who were working as sex workers in the area of the shooting. Both women denied seeing anything related to the shooting when initially questioned by police.

27.     The defendant detectives reinterviewed Bowens and Williams and threatened them with criminal charges unless they identified Johnson and Slaughter as the perpetrators. As a

result of those threats and other acts of coercion, Bowens and Williams signed statements falsely

accusing Johnson and Slaughter of the crime.

28.     Both women were vulnerable to police pressure as they were addicted to cocaine

and engaging in sex work to support their addiction.  Further, Bowens was under probation

supervision, and Williams had open criminal charges.

29.     Defendant Detective Augustine transported Bowens to the Homicide Division,

where defendant Detective Pirrone interviewed Bowens and defendants Harris and Pirrone

interviewed Williams.

30.     Detectives Augustine and Pirrone have been credibly accused of multiple

incidents of misconduct during homicide investigations, including allegations that they have

coerced vulnerable witnesses and suspects into giving false statements.[1]

31.     The defendant detectives conspired to use improper threats and coercion to secure

false statements against Johnson and Slaughter. The arrest warrant and the prosecution of Mr.

Johnson were based on these false and coerced statements.

32.     In 2006, before the first trial, Bowens sent letters to District Attorney Lynne

Abraham and the trial prosecutor, Carlos Vega, stating that her statement was not true and that

she had been coerced by the police.  She explained that she was "forced by Detective Richard

[Harris] and Detective Thomas Augustine to give [her] statement . . . they told me what to say!"

Bowens further requested that the DAO "open an investigation into the Homicide Unit" and she

---

[1] *See* The Homicide Files, PHILADELPHIA INQUIRER, May 7, 2021, available at
https://www.inquirer.com/crime/inq2/philadelphia-murder-homicide-cases-database-
20210507.html#/ (last visited December 16, 2023) (reporting Augustine's involvement in
securing coerced statements in at least five cases including the murder convictions of Anthony
Wright and Walter Ogrod, both of whom have been exonerated). Detective Pirrone has had
similar accusations against him in at least five cases, including cases where Pirrone created false
evidence. *Id.*

made clear that she did not want to testify because she had been "threatened and forced into the statement."

33.     District Attorney Abraham received the letter, but she did not disclose it to Mr. Johnson, nor did she direct the prosecutor in the case, Carlos Vega, to disclose this *Brady* material.  In response to an inquiry from the current DAO regarding the motion to dismiss the criminal charges, Abraham confirmed that she would have reviewed the letter, but that she did not disclose it because prosecutor Vega considered it to be "bullshit" and therefore there was no duty to disclose. The trial prosecutor, Carlos Vega, deliberately suppressed the letters as well pursuant to long-standing practices and customs of the DAO of willfully suppressing information when prosecutors did not believe the facially exculpatory or impeaching evidence was reliable or would lead to an acquittal of the accused.

34.     These critical documents remained secret and suppressed over the many years of post-conviction review. Throughout that time, assistant district attorneys assigned to the DAO's appellate and federal habeas units had access to the files and deliberately failed to disclose the evidence to Johnson or Slaughter, consistent with and pursuant to DAO practices and customs.

35.     Vega suppressed other critical *Brady* evidence, including the report from a pre-preliminary hearing court-ordered competency evaluation of Nora Williams. The evaluation found that Williams suffered from a "Psychotic Disorder –NOS [not otherwise specified], as well as auditory hallucinations." Williams reported that she had been hospitalized for psychiatric issues at least seven times, including in June 2005, two months before the shooting of Officer Flomo.

36.     According to the report, Williams had been placed on medication and remained in psychiatric care for two weeks during the June 2005 hospitalization.  Upon leaving psychiatric

care, she ceased taking her medication, and she continued to experience hallucinations at the time of the shooting and during the investigative phase of this case.

37.     Evidence regarding financial incentives provided to Bowens and Williams was also suppressed, including a promise of cash and dental assistance in exchange for Bowens's testimony and Williams's relocation due to her financial difficulties.

38.     Vega and others within the DAO suppressed all of this information consistent with and pursuant to the above-described DAO practices and customs.

**B.     The 2007 Trial**

39.      In 2007, Johnson was tried with his co-defendant, Slaughter.  Bowens and Williams were the only witnesses who linked Johnson to the shooting, and while both were subject to impeachment, Johnson's counsel was without the critical suppressed evidence that would have entirely undermined their credibility.

40.     Following her pretrial recantation, Bowens was subjected to additional coercion and threats from the defendant officers and trial prosecutor Vega, directing her to testify in a manner consistent with the statements detectives had coerced her to sign during the initial investigation of the case.

41.     As a direct result of the continued coercion and threatening conduct, Bowens testified that she was working as a sex worker on the night of the offense, had finished with a client, and was walking to a house where she intended to get high when Flomo called to her from his car. She rejected his solicitation and, she testified, then told Johnson and Slaughter that Flomo had tried to pick her up. Bowens claimed that soon afterwards she saw the two men at Flomo's car, and then heard gunshots.

42.     Williams testified that she was also working as a sex worker and was engaged with a client at the time of the shooting. Williams claimed that she observed Bowens get into Flomo's car, argue with him, and then get out of his car and walk up the street.  Williams testified that she then saw Johnson and Slaughter approach the car and begin firing.

43.     This testimony was false and was the direct result of the defendant detectives' use of threats, pressure, and coercion to fabricate a prosecution against Johnson.

44.     Johnson presented the testimony of Debra Bryant, who stated that she had observed the shooting, could see the perpetrators, and that Johnson was not involved.

45.     The jury deliberated for nearly three days and acquitted Johnson of first-degree murder, but it was divided on the remaining charges. Slaughter was convicted of third-degree murder and conspiracy and sentenced to 25-50 years.

**C.     The 2009 Trial**

46.     In preparation for Johnson's retrial, Vega offered Slaughter a deal to reduce his term of imprisonment in exchange for testimony against Johnson. Slaughter agreed to provide a statement. Slaughter informed Vega (and at trial, informed the court) that he did so only to get Johnson to negotiate a favorable plea agreement. When that did not come to pass, Slaughter and his lawyer informed Vega and the trial court before the trial that he would not testify as his accusations against Johnson were false.

47.     In the face of numerous valid Fifth and Sixth Amendment objections, the trial court granted Vega's request to force Slaughter to invoke a Fifth Amendment right not to testify, to question him about the substance of the statement, and to call a detective to repeatedly testify as to the full statement, all without any opportunity for cross-examination of Slaughter.

48.     Bowens provided testimony that was consistent in some respects with what she had been coerced to provide at the first trial, but she departed from her identification of Johnson as the perpetrator, stating that she could not be sure it was him she saw at Flomo's car.

49.     Still, the DAO continued to suppress the exculpatory evidence regarding Bowens and Williams that would have allowed Johnson to conclusively undermine the credibility of the evidence against him.

50.     At the conclusion of the second trial, Johnson was convicted of third-degree murder and sentenced to 30-60 years imprisonment.

**D.     Post-Conviction Challenges to the Conviction**

51.     On appeal, the Pennsylvania Superior Court ruled that the admission of Slaughter's statement violated Johnson's constitutional right to confrontation, but the court found that the error was harmless. *Commonwealth v. Johnson*, 29 A.3d 821 (Pa. Super. 2011). The Supreme Court of Pennsylvania denied a petition for allowance of appeal. *Commonwealth v. Johnson*, No. 405 EAL 2011 (May 16, 2012).

52.      On September 10, 2012, Johnson filed a counseled petition for habeas corpus that alleged, among other claims, that the admission of Slaughter's statement violated the Confrontation Clause and that he was prejudiced by the constitutional violation.

53.     Judge Anita B. Brody adopted a Magistrate's Report and Recommendation denying relief but granted a Certificate of Appealability on the Sixth Amendment claim.  In so doing, the Court emphasized "the significant impeachment of the Commonwealth's two key eyewitnesses and the lack of physical evidence connecting Johnson to the murder."

54.     On appeal, the Court of Appeals agreed that Johnson's confrontation rights were violated but ruled that the Pennsylvania Superior Court did not act unreasonably in concluding that the error was harmless.

55.     The United States Supreme Court denied Johnson's petition for certiorari. *Johnson v. Lamas*, 138 S. Ct. 975 (2018).

56.     In 2020, Brenda Bowens, who had made a recovery from her drug addiction and had gained training and employment in the healthcare field, fully recanted her trial testimony, asserting, *as she had stated in her pre-trial letters to Abraham and Vega*, that she was threatened and pressured by the defendant detectives into providing evidence against Johnson and Slaughter.

57.     Based on that recantation, Mr. Johnson filed a PCRA petition seeking to vacate the conviction. In discovery in those proceedings, the prosecution produced the DAO's prosecution files, and counsel found the *Brady* material that had been deliberately suppressed for 18 years.

58.     Mr. Johnson sought relief under Fed. R. Civ. P. 60(b)(3) and 60(b)(6) based on the prosecution's failure to produce this evidence and alleged that these extraordinary circumstances undermined the integrity of the previous habeas proceedings and presented a significant risk of injustice to Johnson.

59.     In the original habeas proceedings, the DAO had argued that Bowens was "unwavering" and "unequivocal" in her identification. That position was entirely undermined by the suppressed *Brady* evidence available to the DAO attorneys who made that argument. The jury would not have found either Bowens or Williams credible had the jury been presented with the suppressed evidence that Bowens recanted her inculpatory statements before trial, informed

prosecutors that she was coerced into making the inculpatory statements, requested that the prosecution investigate misconduct by the officers involved, and was offered financial incentives to testify.

60.     By the same token, the DAO's argument in the original habeas proceeding as to the reliability of Williams would have been undermined by the financial assistance Williams received in exchange for her testimony and by evidence that she was experiencing significant mental health issues, including active hallucinations, at the time she reportedly witnessed the shooting.

61.     The Third Circuit was similarly misled and its ruling that the "identifications fundamentally corroborated each other on points critical to the Commonwealth's theory of the case," *Johnson v. Lamas*, 850 F.3d 119, 134 (3d Cir. 2017), rested on false grounds due to the DAO's withholding of evidence.

62.     In response to Johnson's Rule 60 motion, the DAO agreed that the suppression of the *Brady* material had undermined the prior habeas proceedings, and Judge Brody vacated the conviction and granted a new trial.

63.     Thereafter, the DAO filed a motion to nolle pros the charges, and that request was granted by the Court of Common Pleas on June 8, 2023.

64.     Mr. Johnson was released from prison after 18 years in custody.

**E.     PPD's Unconstitutional Policies, Practices, and Customs**

65.     The unconstitutional conduct of the defendant detectives was directly and proximately caused by long-established practices and customs in the PPD and specifically in the PPD Homicide Division.

66.     Dating back to the 1970s, and continuing beyond the time of the investigation of this case, there is documented evidence of the City of Philadelphia's policy, practice, and custom of unconstitutional misconduct in homicide investigations, and in particular, the concealing and withholding of exculpatory evidence, coercive techniques in interviews and interrogations to obtain incriminating evidence, fabrication of evidence, tampering with or manufacturing evidence, and conducting improper identification procedures.

67.     These practices were well known to the City of Philadelphia and its policymakers by reason of newspaper investigations, including Pulitzer Prize reporting in the Philadelphia Inquirer in 1977, governmental investigations, verified complaints from lawyers and civilians, and internal police investigations.

68.     Judicial findings in a significant number of cases demonstrate that this misconduct was pervasive within the PPD at the time of this case.  The cases include the following:

    a.  **Willie Stokes:** In 1984, PPD detectives arrested Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that a witness had identified him as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that if he did not cooperate with their investigation, they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives who maintained control over him by allowing access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for

39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

b. **Curtis Crosland:** In 1987, PPD officers interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Finally, as Crosland's 1989 trial approached, detectives pressured and coerced a vulnerable witness who suffered from mental health disorders and had attempted suicide to provide testimony asserting that Crosland had expressed fear about the fact that an award offered to the community for information about the shooting would lead to an arrest. Crosland was convicted as a

result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the DAO's Conviction Integrity Unit (CIU) located the referenced exculpatory information in police files. In 2021, a federal district court accepted the CIU's concession that Crosland was entitled to relief and was likely innocent, and, therefore, vacated the conviction.

c. **Pedro Alicea**: In 1989, after failing for four years to resolve a 1985 double homicide of Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea and in doing so disregarded significant evidence demonstrating that two local drug dealers were responsible.  They coerced vulnerable individuals to provide false identifications of Alicea; pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on a number of open charges, to endorse a fabricated statement identifying Alicea as the shooter; coerced Ray Velez, who had himself been implicated in the murders, to falsely identify Alicea as the shooter (by detaining him and threatening to charge him with the murders if he did not submit). The detectives also suppressed exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted and was wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the vacatur of his conviction and release in 2020.

d. **Carlos Hernandez and Ed Williams**: PPD Homicide Division detectives

coerced a false statement from a witness to a robbery and murder by detaining the witness without food or water for days. That statement led to the 1991 arrests of Hernandez and Williams, but it was later proven that Williams had been in a secure-treatment facility at the time of the crime.

e. **Jackie Combs Jr**.: PPD Homicide Division detectives coerced four young witnesses into falsely claiming that Combs committed a murder in 1990. Each witness later provided consistent accounts of the physical and verbal abuse that caused them to give false statements.

f. **Percy St. George**: In 1993, a PPD Homicide detective coerced two persons to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-incrimination and declined to answer questions. Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

g. **Donald Ray Adams:** PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and by offering to provide her financial support for her testimony. Detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement.

h. **Andrew Swainson:** In 1988, PPD Homicide Division detectives based their

arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes.  The witness identified Swainson in a photo array after he was threatened with arrest and told to select Swainson's photograph from an array.  Based on this evidence, among other instances of misconduct, in June 2020, Swainson's conviction was vacated, and all charges were dismissed.

i.  **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with an incontrovertible alibi.  The detectives' conduct led to the Third Circuit's *en banc* decision concluding that the concealment of evidence violated Dennis's due process rights.  *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 307 (3d Cir. 2016).

j.  **Shaurn Thomas**: PPD Homicide Division detectives arrested Thomas in 1993 on charges that he was involved in a 1990 murder.  Thomas had a documented alibi that he was present in juvenile court at the time the murder occurred, but based on testimony from another man who was involved in the murder, he was convicted.  In May 2019, the DAO agreed to dismiss the charges after discovering, among other things, previously undisclosed information in police files showing that officers had questioned a suspect just following the crime who provided police non-public facts about the murder and failed a polygraph test.  Thomas's civil rights suit resulted in a settlement of more than $4 million.

k.  **Anthony Wright**:  Wright was convicted of the 1991 rape and murder of an
    elderly woman based on Homicide Division detectives' fabrication of a
    confession and planting of evidence.  DNA testing later confirmed Wright's
    innocence, and he was acquitted at a retrial.  His subsequent civil rights
    action resulted in a settlement of nearly $10 million.

l.  **Walter Ogrod:** In 1992, PPD detectives coerced and fabricated a false
    confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder
    of a four-year-old girl. Ogrod had driven all night and had not been to bed in
    36 hours when the lead detective interrogated him. Detectives interrogated
    Ogrod for hours, then fabricated a statement in Q-and-A form that they
    falsely claimed was a verbatim record of a voluntary statement.  At his first
    trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a
    retrial three years later, with the aid of a notorious jailhouse snitch, the state
    convicted Ogrod of capital murder. Ogrod has since been exonerated, the
    charges dismissed, and he was released from prison after serving more than
    25 years. Ogrod's civil suit resulted in a settlement of $9.1 million.

m.  **Willie Veasy:** Veasy was convicted of murder based on a 1992 confession
    secured by PPD Homicide Division Detectives' use of physical force. At the
    time of the murder, Veasy was working in a restaurant miles from the scene
    of the crime. Veasy's conviction was vacated in 2019 upon the motion of the
    DAO, and his subsequent civil rights suit resulted in a multi-million-dollar
    settlement.

n.  **Steven Lazar:** Lazar was convicted of a 2007 murder as a result of PPD

18

Homicide Division Detectives, including defendants Booker and McDermott, fabricating witness statements and securing a false confession by knowingly subjecting Lazar to more than 30 hours of interrogation while he was undergoing severe opioid withdrawal. Lazar's conviction was vacated in March 2023 based on the discovery of suppressed evidence after he had spent approximately 16 years in prison.

o.  **Bruce Murray:** In 1983, Murray was convicted of a 1980 murder based on PPD Homicide Division Detectives knowingly presenting fabricated trial testimony, coercing false witness statements, and suppressing exculpatory evidence. Murray was exonerated in April 2023 based on the DAO's acknowledgement that numerous pieces of favorable evidence were suppressed during the original trial.

p.  **Gerald Howell:** In late 1982 into the early months of 1983, Philadelphia Police Detectives coerced witnesses into inculpating Howell in a murder that was committed by Kenneth Parnell. PPD Detectives told Arlene Williams, a teenager at the time, that they would arrest Parnell, the father of her child, for the murder if she did not sign a statement inculpating Howell. PPD Detectives also threatened two other teenage witnesses with arrest if they did not come to court to testify against Howell, even though the police had reason to believe that Parnell was the real shooter. Additionally, PPD Detectives suppressed information given to them by the brother of the decedent that Parnell was the shooter. Years later, Parnell confessed to the murder for which Howell had been convicted. In 2022, the DAO conceded

that the PPD had suppressed exculpatory evidence. In 2023, a federal judge granted Howell's habeas corpus petition and vacated his conviction. Howell was released in 2023 after being imprisoned for four decades for a crime he did not commit.

69.     As evidenced by the pervasive nature of the conduct in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

70.     At the same time, detectives and officers in the Homicide Unit and other assignments had engaged in systemic constitutional violations of suspects in criminal investigations, pursuant to practices and customs of violating the Fourth and Fifth Amendments. As a result, courts in this district enjoined the Police Department and the City to prevent and otherwise remedy these constitutional violations.  *See*, *e.g.*, *Cliett v. City of Philadelphia*, No. 85-cv-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1,500 individuals through drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in the Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, No. 88-cv-2264 (E.D. Pa. 1988) (enjoining stops, detentions, and searches of African-American men during investigation of the "Center City Stalker").

71.     Thereafter, in the late 1980s and early 1990s, a narcotics squad operating out of the 39th Police District engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations,

and theft.  This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the City of Philadelphia, including the disregard of credible complaints to the PPD Internal Affairs Division and the District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

72.     These systemic and unconstitutional practices and customs had been ignored, with deliberate indifference by the City of Philadelphia, and were addressed only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office.

73.     After a full investigation by these outside agencies, and the filing of a class action lawsuit, a court entered a Consent Decree requiring wide ranging reforms in the PPD, and in particular the cessation of improper PPD investigative practices and policies.  *See NAACP v. City of Philadelphia*, No. 96-cv-6045.

74.     In sum, at the time of the investigation and prosecution of Mr. Johnson, the City of Philadelphia and its policymakers were deliberately indifferent to PPD's policy, practice, and custom of:

> a.   Concealing and/or failing to disclose exculpatory evidence, engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, fabricating and planting evidence, fabricating witness and suspect statements, and using improper identification procedures;
>
> b.   Using these practices to target people of color for unlawful treatment;
>
> c.   Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or PPD Directives;

d. Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

e. Ignoring systemic patterns of police misconduct and abuse of civilians in police investigations and prosecutions, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

f. Failing to properly sanction or discipline PPD officers who were aware of and concealed and/or aided and abetted violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of persons such as Mr. Johnson.

75. The City of Philadelphia has been deliberately indifferent to the constitutional duty to train, supervise, and discipline police officers. Specifically, the Internal Affairs Division (IAD) of the PPD and PPD Commissioners have failed to impose meaningful disciplinary and remedial actions in investigations marked by the following deliberately indifferent practices:

a. Excessive and chronic delays in resolving disciplinary complaints;

b. A lack of consistent, rational, and meaningful disciplinary and remedial actions;

c. A failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d. A failure to establish a credible and fair internal investigatory process;

e.   Imposing incident-based, rather than progressive discipline, resulting in the failure to penalize repeat violators;

f.   Failure to institute necessary training and supervision for IAD investigators in order to ensure proper investigations;

g.   Failing to institute quality control measures to ensure valid IAD findings and conclusions;

h.   Failing to adopt an effective early warning system to identify, track, and monitor officers with significant disciplinary infractions;

i.   Failing to interview available eyewitnesses to incidents involving citizen complaints of misconduct; and

j.   Failing to acknowledge the disproportionate and extreme use of violence and other improper conduct used by police officers.

76.   The City of Philadelphia, through its deliberate indifference, was a moving force in the violation of Mr. Johnson's constitutional rights.

**F.   The DAO's Unconstitutional Policies, Practices and Customs**

77.   Defendant DAO caused the wrongful conviction of Mr. Johnson by reason of a pervasive practice and custom of failing to disclose *Brady* exculpatory and impeachment evidence, and by the actions of then District Attorney Lynne Abraham who, as the final policymaker in the DAO, failed to disclose exculpatory and impeaching evidence to Mr. Johnson.  The actions of Abraham, as the final policymaker, are attributable to the DAO.

78.   As alleged above, the DAO file in this case contained numerous documents that constituted *Brady* exculpatory and impeachment evidence which the District Attorney and the trial prosecutor, Carlos Vega, deliberately suppressed, and which were then suppressed for 18

years by other assistant district attorneys who represented the prosecution in direct appeal and federal habeas proceedings.

79.     Included in this array of *Brady* material were letters sent to Abraham and Vega by Brenda Bowens, the main prosecution witness, whose statements and testimony were the product of threats and coercion by the defendant detectives.  Abraham and Vega deliberately suppressed this evidence, thus preventing the defense from proving that the testimony of Bowens and Williams was the direct result of coercion and threats.

80.     Abraham received and read the letter addressed to her and, without an investigation or inquiry about the case or circumstances of the threats and coercion described in the letter, she did not disclose the letter to counsel for Mr. Johnson. Instead, she forwarded it to the DAO Homicide Unit where, pursuant to practice and custom in the DAO, Vega suppressed this and other *Brady* evidence. Abraham acknowledged that she would have reviewed the letter, but did not disclose it because Vega considered it to be "bullshit."

81.     For decades dating back to the 1970s, the DAO as a matter of practice, policy, and custom, failed to properly train, discipline, and supervise prosecuting attorneys with respect to their duty to disclose *Brady* material.  The DAO throughout the time of Mr. Johnson's direct appeal and unsuccessful habeas litigation did not train, discipline, or otherwise sanction assistant district attorneys for withholding *Brady* material.  To the contrary, assistant district attorneys in the appeals and post-conviction units were instructed not to review files for any possible *Brady* violations and that even upon viewing such documents there was no duty to disclose them to the defendant.

82.     The practice and custom of the DAO before and during Mr. Johnson's direct appeal and unsuccessful habeas litigation of failing to abide by *Brady* disclosure requirements is

evidenced by exonerations of criminal defendants subjected to that practice and custom, and by other post-conviction adjudications based on prosecutors' deliberate withholding of *Brady* material.  These cases include:

    a.  **Commonwealth v. Robert Devine**: In 2023, the Court of Common Pleas granted a new trial to Devine following disclosure of *Brady* evidence that had been suppressed by the DAO from time of his trials in 2003 through to PCRA proceedings where, as in the Johnson case, defense counsel found the exculpatory and impeaching evidence in the DAO file. In Devine's case, the DAO had stated in discovery proceedings that it had no information of sexual assaults committed in the same type of unique circumstances (sexual assault by tree branch) as the assaults with which Devine was charged. However, the DAO file contained a formal Memo from the PPD that listed other such sexual assaults during the relevant time period.

    b.  **Commonwealth v. Alen Lee**: Lee was falsely convicted of murder for which he served 15 years in custody before his full exoneration in 2004 in post-conviction proceedings in which the DAO conceded Lee's right to a new trial and dismissal of all charges.  Detectives William Shelton and Leon Lubiejewski and Assistant District Attorney Arlene Fisk conspired to suppress exculpatory evidence, and in particular information from New York City and Washington D.C. law enforcement officers that another person, and not Lee, was responsible for the murder. That person had confessed to being involved in the murder and had named another perpetrator, and not Lee, as a co-conspirator.  Further, there was evidence that the detectives engaged in

suggestive identification procedures and that the person who was involved had fled the jurisdiction. Lee's civil action following his exoneration resulted in a settlement with a significant payment of damages.

c.  **Commonwealth v. Christopher Williams:** Williams was prosecuted for a 1989 triple homicide and another 1989 homicide. His PCRA petitions were granted, and his convictions vacated following disclosure of *Brady* evidence that had been suppressed by the DAO from the time of Williams's 1992 and 1993 trials through to 2019, when the DAO disclosed the DAO and police files to defense counsel. In both cases, the DAO called David Lee as a witness without disclosing the full details of his prior involvement in two other homicide cases nor his role as a federal informant, and thereafter repeatedly made false statements in court filings about the nature of Lee's prior involvement in other homicide cases. In both cases, the DAO also called James White without disclosing that the DAO promised to help secure White's early release in exchange for his guilty plea to these and two other homicides. In the triple homicide, the DAO suppressed statements from witnesses that contradicted White's testimony, as well as evidence of an extensive police investigation into an alternative suspect. Williams's triple homicide conviction was vacated in 2019, and his other conviction was vacated two years later. A civil rights action following Williams's exoneration resulted in a settlement and a payment of substantial damages.

d.  **Commonwealth v. Walter Ogrod:**  As described above, Ogrod was prosecuted for murder of a four-year-old child on a theory of intentional

assault and convicted at a second trial in 1996. In post-conviction

proceedings, the Commonwealth, represented by Defendant DAO, conceded

his entitlement to relief on the grounds of the deliberate suppression and non-

disclosure of *Brady* material by the homicide unit and the DAO, as well as

DAO *Napue* violations, that showed that (1) the child died of asphyxia and not

head wounds as charged at trial, (2) the investigating detectives coerced a

false and unreliable confession and (3) jailhouse informants who testified

against Mr. Ogrod were entirely unreliable and were provided benefits not

disclosed to the defense. With respect to the claims alleging suppression of

*Brady* material by the DAO, the Answer expressly acknowledged that "[f]or

decades and with some frequency, it appears that the Philadelphia District

Attorney's Office failed to comply with its obligations in regard to *Brady* and

its progeny." Based on the allegations, the DAO concession, and the record in

the case, Ogrod was granted a new trial and all charges were dismissed.

e.  **Commonwealth v. Eddie Ramirez**: Ramirez was prosecuted for the 1995

murder and robbery of a woman at the laundromat where she worked, where

the murder was alleged to have been perpetrated via violent punches to the

victim's head. At the time of trial, Ramirez's defense counsel argued that he

could not have committed the murder because the perpetrator would have had

the victim's blood on his person and Ramirez had no blood on him at the time

he was arrested. The prosecution, however, downplayed this argument,

claiming that the absence of blood was not exculpatory. It did so, however,

while suppressing information in the DAO files concerning a conversation

with an investigator from the Philadelphia Office of Medical Examiner in which the investigator provided an opinion that the perpetrator would not only have his clothes covered with the victim's blood, but also his face and hands. For years, the DAO suppressed this and multiple other pieces of exculpatory information, including evidence regarding efforts to coerce the prosecution's key witness to identify Ramirez as the perpetrator. Once Ramirez and his counsel gained access to the DAO's files, Ramirez sought post-conviction relief, and, in November 2023, his conviction was vacated. Following that vacatur, the DAO released a statement acknowledging that prior administrations had withheld substantial exculpatory information and apologizing to the court, the victim's family, and Ramirez.

**G.    The Violations of Mr. Johnson's Constitutional Rights and the Resultant Harms and Losses**

83.    Mr. Johnson's unlawful arrest, prosecution, conviction, and incarceration were caused by the conduct of the individual defendants, the City of Philadelphia, and the DAO.

84.    The individual defendants knowingly, intentionally, and recklessly fabricated evidence, concealed and suppressed exculpatory information, and maliciously prosecuted Johnson pursuant to policies, practices, and customs of defendant City of Philadelphia, including the failure, with deliberate indifference, to properly train, supervise, and discipline officers and detectives who engaged in unconstitutional conduct.

85.    The DAO caused the violations of Mr. Johnson's due process rights to a fair trial and to disclosure of *Brady* evidence by virtue of a long-standing practice and custom of suppressing exculpatory and impeaching evidence; failing as a matter of policy, practice and custom, to properly train, supervise and discipline assistant prosecutors as to their duties under

*Brady*; by the actions of the final policymaker for the DAO, Lynne Abraham, in not disclosing *Brady* material to counsel for Johnson on the ground that it was not reliable; and permitting prosecutor Vega to engage in the same misconduct.

86.     The unlawful conduct outlined above caused Mr. Johnson to be improperly arrested, prosecuted, and imprisoned for 18 years for a crime he did not commit.

87.     As a direct and proximate result of defendants' actions and omissions, Mr. Johnson sustained loss of his freedom, loss of productive years of his adult life, pain and suffering, mental anguish, emotional distress, indignities, loss of natural psychological development, and restrictions on personal freedoms and autonomy, including educational, vocational, and athletic opportunities, sexual relationships, family relations, travel, and freedom of speech and expression.

88.     As a direct and proximate result of the defendants' actions and omissions, Mr. Johnson sustained economic injuries and damages, including loss of income and loss of career opportunities.

89.     As a direct and proximate result of defendants' actions and omissions, Mr. Johnson sustained and continues to suffer physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

90.     As a direct and proximate result of defendants' actions and omissions, Mr. Johnson sustained mental health injuries and damages, including adverse psychological symptoms, mental anguish, and emotional distress, which he continues to experience, and which will continue in the future.

## V.      Causes of Action

## Count 1

### Plaintiff v. Individual Detective Defendants
### Section 1983—Violation of the Due Process Clause of the Fourteenth Amendment:
### Coercion and Threats to Fabricate Evidence

91.     The individual defendants coerced and threatened witnesses to provide false

statements inculpating Mr. Johnson and thereby fabricated evidence that caused his wrongful

conviction. The fabrication of this evidence violated Mr. Johnson's right to a fair trial and due

process of law under the Fourteenth Amendment to the U.S. Constitution.

## Count 2

### Plaintiff v. Individual Detective Defendants
### Section 1983--Malicious Prosecution in Violation of the Fourth and Fourteenth
### Amendments

92.     The individual defendants caused the initiation of a prosecution against Mr.

Johnson without probable cause and with malice, thereby subjecting Mr. Johnson to a malicious

prosecution in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, and

that prosecution was terminated favorably to Mr. Johnson.

## Count 3

### Plaintiff v. Individual Detective Defendants
### Section 1983-- Suppression of Exculpatory Evidence in Violation of the Fourteenth
### Amendment

93.     By suppressing exculpatory and impeaching evidence, the individual defendants

violated Mr. Johnson's right to due process of law under the Fourteenth Amendment to the U.S.

Constitution.

**Count 4**

**Plaintiff v. Defendant City of Philadelphia**
**Municipal Liability**

94.      Defendant City of Philadelphia, with deliberate indifference, adopted and

acquiesced in policies, practices, and customs which were a moving force in the violation of Mr.

Johnson's constitutional rights by the defendant detectives, including policies, practices, and

customs of a failure to properly train, supervise, and discipline officers.

**Count 5**

**Plaintiff v. Defendant Philadelphia District Attorney's Office**
**Section 1983—Governmental Liability for Violations of Fourteenth Amendment by Failing**
**to Disclose Exculpatory and Impeachment Evidence**

95.      Defendant DAO, acting with deliberate indifference and by the actions of final

policymaker District Attorney Lynne Abraham, caused the violation of Mr. Johnson's rights to

due process of law by failing, as a matter of policy, practice, and custom, to properly train,

supervise, and discipline prosecutors with respect to their constitutional obligations to disclose

all material impeaching and exculpatory evidence and in a custom and practice of suppressing

impeachment and exculpatory evidence on a subjective belief that the evidence was not reliable,

all in violation of the Fourteenth Amendment.

**Count 6**

**Plaintiff v. Individual Detective Defendants**
**Supplemental State Claim – Malicious Prosecution**

96.      The individual defendants caused the malicious prosecution of Mr. Johnson in

violation of the laws of the Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiff William Johnson respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to the individual defendants;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ David Rudovsky
David Rudovsky
ID No. 15168
Jonathan H. Feinberg
ID No. 88227
Grace Harris
ID No. 328968
KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400

Emma Freudenberger*
NEUFELD SCHECK BRUSTIN
  HOFFMAN & FREUDENBERGER LLP
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

*Counsel for Plaintiff*

* Motion for *pro hac vice* admission forthcoming